**WESTERN ELECTRIC COMPANY, INCORPORATED, Plaintiff,**

v.

**COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, Defendant.**

**No. 76–C–1175.**

United States District Court, E. D. New York.

April 4, 1978.

Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City, for plaintiff; David L. Benetar, Robert A. Levitt, Michael I. Bernstein, New York City, of counsel.

Kane & Koons, Washington, D. C., Cohn, Glickstein, Lurie, Ostrin & Lubell, New York City, for defendant; Charles V. Koons, Washington, D. C., Philip D. Tobin, Daniel W. Meyer, New York City, of counsel.

BARTELS, District Judge.

· This is an action under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), and Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10, to vacate a labor arbitrator's opinion and award. Plaintiff, Western Electric Company, moves pursuant to F.R.Civ.P. Rule 56 for summary judgment vacating the award, and defendant, Communications Workers of America, AFL–CIO ("CWA"), cross-moves for summary judgment on its counterclaim for compliance.

Western Electric and CWA were parties to a collective bargaining agreement dated August 11, 1974, which provided, among other things, for arbitration of grievances arising with respect to interpretation of the agreement or performance of obligations under it. In September, 1975, pursuant to the provisions of Article 7, paragraph 1.6,[1]

---

1. Article 7, paragraph 1.6 provides that
   If the International and the Company fail to settle by negotiation any grievance arising with respect to the interpretation of this contract, or the performance of any obligation · hereunder, such grievance may be subject to

and Article 8,[2] of the agreement, Western Electric and CWA submitted the following question for arbitration:

> Did the Company violate Article 13, paragraph 2.18 of the collective bargaining agreement when it changed existing routes and mileage measurements from various computation points to job locations *within the New York Installation area*? If so, what shall the remedy be?[3] (Emphasis added.)

The basis for the above question was a dispute over compensation paid by Western Electric to its equipment installers for travel over certain routes in the New York Installation area. Installers, represented in New York by CWA Local 1190, are assigned on a day-to-day basis to work at any one of approximately 270 "job locations" in the New York area. Job locations are telephone company buildings in which installers work, as needed, installing the central switching equipment used to connect and transfer local, national, and overseas telephone messages. Because installers' assignments may vary from day to day, the 1974 collective bargaining agreement provided, as had agreements since 1962, that installers would be paid an allowance for travelling to their assigned job locations. This allowance, which is a form of wages reported on the installers' W–2 tax forms, is calculated using projected travel routes theoretically taken by installers to reach their assigned job locations. Rather than projecting a set of routes from each installer's home, routes are established using centrally located "computation points" as their points of origin. In New York there are twelve computation points and over 3000 projected routes. Although an installer is not actually expected to go to his computation point and travel along the projected routes, the designated route between the computation point closest to his home and his job location determines his travel compensation.

Article 13, paragraph 2.18, under which the present dispute arose, governs the selection of these projected computation point to job location routes and provides that:

> The Company shall select the route and shall determine the road mileage measurement for that route. . . .

Despite this language, which appeared in both the 1974 collective bargaining agreement and the 1962 agreement which established the compensation plan, the computation point-job location routes in the New York Installation area were not selected by Western Electric acting alone. Instead, the New York area routes, originally selected in 1962, and still in effect when this dispute arose, were the product of a joint effort by representatives of Western Electric and CWA Local 1190 working together in two-

---

arbitration in accordance with Article 8 of this contract as the final step in the settlement thereof.

2. Article 8 provides that

1. If the International and the Company fail to settle by negotiation any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder, such differences shall (provided that such dispute is not excluded from arbitration by other provisions of this contract, and provided that the grievance procedures as to such dispute have been exhausted) be referred upon written demand of either party to an impartial arbitrator mutually agreeable to both parties. Such demand shall be presented within ninety (90) days after the Company notifies the Union of its final answer to the grievance. Each such referral shall include but one such dispute unless otherwise agreed. If, within ten (10) days of such demand, the parties are unable to agree on the person to be selected as arbitrator, an arbitrator shall be designated upon request of either party by the Federal Mediation and Conciliation Service or the American Arbitration Association. The direct expense of the arbitration, but not including the expense incurred by the parties or their witnesses, shall be borne equally by the Union and the Company.

2. The arbitrator shall have no authority to alter or modify the provisions of this contract. Any decision made in compliance with the foregoing shall be final and the parties agree to abide by such decision.

3. Article 13, paragraph 2.18 provides that

The Company shall select the route and shall determine the road mileage measurement for that route, for the purposes of [travel compensation], and road mileage tables (such as Rand McNally Standard Highway Mileage Guide) shall be used for determining mileage, where possible.

man teams. These teams were guided in the process of establishing a plan of New York area routes by a booklet prepared in 1962 by Western Electric's national management, which called for the selection of routes which were both short and practical, and also indicated that:

> Although considerable effort may be required to establish this plan, once routes have been selected and measurements made, changes in the listings would be quite infrequent. Only unusual conditions, such as the opening of new highways, bridges, etc., would possibly require the need for re-establishing routes and measurements.

The New York area routes which the Western Electric-CWA teams selected in 1962 were often the most practical, though not always the shortest, and in keeping with the 1962 booklet were revised from time to time when new bridges or other improvements became available. In addition, individual routes were occasionally remeasured when discrepancies were found between their theoretical length and their actual length.

Although travel compensation is primarily determined by the length of computation point-job location routes, there is an additional factor which affects travel allowances. That factor is the relationship between an installer's computation point, the job location to which he is assigned on a particular day, and his "Base Location," a focal point of regional installation work. While the Western Electric-CWA collective bargaining agreement does not specify the myriad job locations and computation points used across the country, it does specify all of Western Electric's Base Locations nationwide. These Base Locations, which are of primarily local importance, are initially discussed and agreed upon at the local level and then included in the national agreement if approved by the national negotiators.

In the summer of 1974, national representatives of Western Electric and CWA International were meeting in New York to negotiate the 1974 collective bargaining agreement. Simultaneously, local negotiations were taking place in New York between James J. McGarry, Western Electric's New York Installation area manager, and John Flanagan, who was both President of CWA Local 1190 and one of CWA International's bargaining representatives in the national negotiations. The local negotiations were initiated by McGarry in response to directives from his superiors, including Western Electric's Director of Operations for New York, that efforts be made to reduce the cost of travel compensation in the New York Installation area. The cost reduction plan which McGarry initially presented to Flanagan called for the inclusion of two new Base Locations in the 1974 national agreement, to supplement the single New York Base Location already in existence. It also called for relocation of New York area computation points to new positions which would further reduce compensation. Flanagan rejected this plan and insisted that Local 1190 would not agree to inclusion of any new Base Location without receiving concessions to minimize its compensation reducing effects. The negotiations on this point lasted for three months, during which McGarry and Flanagan explored a wide range of alternatives. They reached a final agreement which they reduced to writing in a letter signed August 9, 1974, two days before the national agreement was concluded. The August 9 letter provided that McGarry would shift three computation points to new positions which would increase the compensable length of routes originating at those points, and keep the remaining computation points unchanged for the duration of the 1974 national agreement. In exchange, Flanagan and Local 1190 approved the new Base Location for the New York area which Western Electric sought to include in the 1974 national agreement.

In keeping with the August 9 local agreement, the new Base Location was inserted in the 1974 collective bargaining agreement, giving Western Electric a total of two New York Base Locations. McGarry changed the three computation points which had

been agreed upon, and left the remaining eight New York area computation points unchanged, as promised. As a result of shifting three computation points and adding a new computation point to correspond to the new Base Location, it was necessary to map out new routes between those new points and existing job locations. Prior to making these changes, and while the local negotiations were still going on, McGarry and his staff had begun to examine all existing routes between New York area computation points and job locations. McGarry made reference to this examination during the talks with Flanagan, but only with respect to filling scattered gaps in the routes, and correcting mileage inaccuracies which his staff had found. During the arbitration hearings, McGarry conceded that based on his staff's examination, he had anticipated making significant route revisions, but intentionally withheld this information from Flanagan and the union. After local agreement had been reached, and after the national agreement, with its new Base Location had been ratified, McGarry and his staff began mapping out routes for the shifted computation points, increasing the combined length of these routes by a total of eight miles. In addition, they began to work on the routes between job locations and the computation points which had remain unchanged. However, rather than filling in gaps and correcting mileage measurements, McGarry and his staff began an overall revision and remapping of these routes which substantially reduced their aggregate length, more than completely offsetting the eight miles gained by the union in the computation point shift. McGarry conceded during the arbitration hearing that if he had revealed his intention to make these revisions, it would have been difficult or impossible for Western Electric to have obtained union approval of a new Base Location in the New York area.[4] Flanagan confirmed this, testifying that he would not have settled for a shift in three computation points and a gain of eight miles if he had known that impending route revisions were going to eliminate that gain.[5] When the revisions were made, Local 1190 opposed them and brought two grievances. The parties were unable to resolve these through the Local and International grievance procedures, and ultimately submitted their dispute to arbitration.[6]

### The Arbitrator's Award

The arbitrator conducted three days of hearings during which he heard testimony from McGarry, Flanagan, five other witnesses, and lawyers for both parties. On

---

**4.** During the arbitration hearing McGarry was cross-examined by the lawyer for CWA International about his undisclosed intention to make New York area route revisions. McGarry's testimony was as follows:

Q But you knew that your people were looking at the Hicksville possible route changes.

A They were looking at all of them. They would have to remeasure from all CP's.

Q You didn't tell the union about that in the course of your 1974 negotiations, did you?

A I don't think I would muddy the water with all the individual little discrepancies that I had, no.

Q You wouldn't muddy the water because then it would create some difficulties for you, wouldn't it?

A It wouldn't have made things easy.

Q Right. Much easier if you kept quiet about that and negotiated a simple agreement where you would get a new base location for Long Island East in return for which you would give the union three new compu-

tation points or changing three new computation points; it would make it that much easier, wouldn't it, it wouldn't complicate negotiations; isn't that a fact?

A Yes. I would have to agree.

**5.** In describing his previous testimony that he had not discussed route changes with McGarry, Flanagan said:

The word that I used may lead you to think I didn't care. But I think it would be assinine [sic] to go in and negotiate with a man to get two additional miles for Brooklyn and Queens and four additional miles from Staten Island and say for the eight other thousand miles I don't give a * * * what you do, pardon me.

**6.** The two grievances initially brought by CWA Local 1190 concerned Western Electric's failure to use Rand-McNally or other standard mileage tables in measuring the revised routes. The question the parties finally submitted to arbitration concerned Western Electric's right to make these revisions in the first instance.

the basis of the testimony before him describing the dispute, Western Electric's past practice of selecting New York area routes through joint cooperation with Local 1190, and the 1974 national and local negotiations, the arbitrator issued his opinion and award concluding that Western Electric had violated the collective bargaining agreement. The arbitrator articulated two specific grounds for his finding and award. The first was that the August 9 letter of understanding modified and froze Western Electric's rights under the national labor agreement and eliminated any right to make revisions which Western Electric might have otherwise had. The second was that, independent of an interpretation of the August 9 letter, Western Electric was estopped from revising New York area routes for the life of the 1974 agreement by virtue of McGarry's representations on the company's behalf which induced Flanagan and Local 1190 to recommend inclusion of the new Base Location in that agreement, to Western Electric's benefit.

### Western Electric's Contentions

Concerning the arbitrator's award, Western Electric contends that the arbitrator improperly exercised his jurisdiction by failing to answer the question submitted. It bases this contention (1) on the arbitrator's refusal to determine whether the power to "select" routes, expressly provided by Art. 13, par. 2.18, implicitly embraces the power to "reselect" routes, and (2) on his treatment of the August 9 agreement between McGarry and Flanagan as a modification of the 1974 national agreement. Western Electric also contends that the arbitrator's award draws its essence not from the 1974 collective bargaining agreement but from the non-arbitrable August 9 agreement.

### Scope of Review

The scope of this court's power to review a labor arbitration award has been narrowly limited by statute and case law. Under § 10(d) of the Federal Arbitration Act, 9 U.S.C. § 10(d), an arbitrator's award in this type of case, involving neither misconduct nor corruption on the part of the arbitrator, can be set aside only

> Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

The powers of an arbitrator are defined by agreement of the parties: the question they submit both establishes and limits the arbitrator's jurisdiction. *Transport Workers U. of A. v. Fifth Ave. Coach Co.*, 187 Misc. 247, 63 N.Y.S.2d 657 (Sup.Ct.N.Y.Cty.1946). It is the reviewing court's duty to determine whether the arbitrator has acted within that jurisdiction.

This general standard, applicable to both labor and non-labor arbitrations, has been even more narrowly circumscribed in the area of labor-management relations by the Supreme Court's opinions in the Steelworkers Trilogy: *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), and the extensive line of cases following it. In *Enterprise*, the Supreme Court made it clear that courts do not sit to review the merits of an arbitration award, a view it reiterated in *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), observing that:

> Courts are not to usurp those functions which collective-bargaining contracts have properly "entrusted to the arbitration tribunal." They should not undertake to review the merits of arbitration awards but should defer to the tribunal chosen by the parties finally to settle their disputes. (Citations omitted.)

But while courts do not sit to determine whether the arbitrator has resolved a dispute as they would have, *Baldwin-Montrose Chemical Co. v. Int'l U. of Rubber, Cork, Linoleum and Plastic Workers of America*, 383 F.2d 796 (6th Cir. 1967); *Int'l Bro. P. S. P. M. W. Local U. v. St. Regis Paper Co.*,

362 F.2d 711 (5th Cir. 1966), the court must decide whether an arbitrator has properly fulfilled his mandate. The standard by which an arbitrator's opinion and award must be evaluated was articulated by the Supreme Court in *Enterprise, supra,* 363 U.S. at 597, 80 S.Ct. at 1361, holding that:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When an arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

██ Although the arbitrator's award is enforceable only if it draws its essence from the collective bargaining agreement, the arbitrator may look beyond the terms of the agreement. As the Supreme Court stated in *Warrior & Gulf, supra,* 363 U.S. at 581–582, 80 S.Ct. at 1352,

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law— the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it.

Consequently, in reviewing the arbitrator's award in this case, it is necessary to determine whether his opinion and award draw their essence from the collective bargaining agreement as interpreted in light of the parties' intent revealed through bargaining history, past practices, rights established under earlier agreements, and other rudimentary sources of contract construction. *Humble Oil Refining Co. v. Local 866, Int'l Bro. of Teamsters,* 447 F.2d 229 (2d Cir. 1971); *Int'l Union, U. A. A. & A. I. W. of A. v. White Motor Corp.,* 505 F.2d 1193 (8th Cir. 1974); *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123 (3d Cir. 1969).

### Discussion

Rather than calling for a determination of Western Electric's rights under Art. 13, par. 2.18 in any and all circumstances, the question submitted to arbitration called for a determination of Western Electric's rights in the specific context of the disputed New York area route revisions. The arbitrator reached his conclusion as to those rights not by interpreting Art. 13, par. 2.18 in the abstract, but by construing it in light of the parties' conduct in the New York Installation area. In reaching his conclusion, the arbitrator considered Western Electric's past practice of selecting New York area routes through joint cooperation with CWA Local 1190. He considered the concessions Western Electric had made to obtain the additional New York Base Location, and he also considered the significance of computation points and routes in determining travel compensation. In light of these factors, the arbitrator concluded that even assuming Western Electric would have otherwise had the right to "reselect" routes under Art. 13, par. 2.18, its conduct estopped it from invoking that right to make the disputed New York area route revisions. Having reached this conclusion, the arbitrator found it unnecessary to make a general determination of Western Electric's Art. 13, par. 2.18 rights in other contexts.

██ Although the arbitrator's refusal to determine Western Electric's rights under Art. 13, par. 2.18 made it impossible to determine whether those rights had been "violated," it did not, as Western Electric contends, foreclose a resolution of the basic dispute underlying the submission. The submission essentially called for a determination of Western Electric's right to unilaterally make the disputed New York area route revisions, and the arbitrator's finding of estoppel determined those rights. Having resolved the underlying dispute, the arbitrator's award cannot now be set aside because of the arbitrator's refusal to go beyond the facts of the submitted dispute and make an unnecessary determination of whether, in principle, the power to "select" routes encompassed the power to "reselect" routes. *See International Bro. Pulp, S. & P. M. W. v Allied Paper Co.,* 447 F.2d 1344

(5th Cir. 1971); *Dallas Typographical U. No. 173 v. A. H. Belo Corp.,* 372 F.2d 577 (5th Cir. 1967); *American Bosch Arma Corp. v. International U. of E., R. & M. W.,* 243 F.Supp. 493 (D.Miss.1965); *Application of States Marine Corp. of Del.,* 127 F.Supp. 943 (S.D.N.Y.1954).

As Western Electric contends, the arbitrator did rely heavily on the August 9 agreement in reaching his award. Had the arbitrator based his opinion and award solely on an interpretation of that agreement, we would have to agree that he had failed to answer the question submitted. *See Socony Vacuum Tankermens Ass'n v. Socony Mobil Oil Co.,* 369 F.2d 480 (2d Cir. 1966). However, the arbitrator did consider Art. 13, par. 2.18 and did not rely solely on the August 9 letter in answering the question submitted. The arbitrator concluded that Western Electric could not rely upon any rights it had under Art. 13, par. 2.18 as far as New York area route revisions were concerned. The fact that he relied heavily on the August 9 letter in reaching this conclusion is no justification for setting aside the award. *See Warrior & Gulf, supra.*

Western Electric's second principal contention concerns the arbitrator's holding that:

> Whatever might be the correct answer otherwise to the Company's rights under the basic CWA Agreement to re-designate Computation Points and re-select routes whenever it sees fit, the August 9 agreement between McGarry and Flanagan *modified and froze those rights in*

*the New York Area for the life of the 1974 agreement.* [Opinion at 24.] (Emphasis added.)

Western Electric correctly contends that the August 9 agreement did not comply with the local bargaining provisions of Art. 3, paragraphs 3, 4 and 6, as an amendment,[7] and accordingly could not modify the 1974 national collective bargaining agreement. The arbitrator's finding that the August 9 agreement modified or froze any rights under Art. 13, par. 2.18 must therefore be rejected. However, the August 9 agreement was effective for another purpose. To effectuate the local items specified therein it was unnecessary to modify the national agreement or to comply with Art. 3. Both Western Electric and CWA complied with the express terms of the August 9 agreement, and Western Electric has enjoyed the benefit of the added Base Location it obtained by virtue thereof. Therefore Western Electric must be bound by the consequences of its conduct in obtaining that benefit.

In reaching his ultimate conclusion and award, the arbitrator found that regardless of the correct reading of the August 9 agreement between McGarry and Flanagan, Western Electric's conduct in entering into that agreement estopped it from claiming any right to make the disputed route revisions. According to the arbitrator,

> what McGarry did was to lull the Union into executing the agreement at a time

---

7. Article 3 provides that
   3. The International shall have exclusive bargaining authority except insofar as jurisdiction is herein specifically delegated to the Locals. With respect to any subject proper for collective bargaining and exclusively local in character, not covered by this contract, the International may, by specific delegation, authorize the Local to bargain locally on such subject. In each such case, the International shall forward to the Company a copy of the delegation of authority.
   4. The Local Management and the respective Local will negotiate the settlement of grievances in accordance with the provisions of Article 7 and will bargain collectively on subjects specifically delegated to the Local in accordance with the provisions herein.

The formal or informal writings evidencing agreements reached as a result of such collective bargaining shall show the Union party to be the International and said writings shall be signed by the duly authorized representative of the Local Management and by the International.
   6. The Company and the International will bargain collectively on all subjects proper for collective bargaining, not delegated to the Locals or, if so delegated, after they have been transferred to the International and the International has notified the Company that such transfer has been accepted. Any formal or informal writings evidencing agreements reached will be signed by the Company and the International.

when he visualized making route changes and designedly withheld this from the Union. [Opinion at 26.]

The arbitrator found that while McGarry had advised Flanagan that there might be mileage reductions because of route remeasurements and revisions incorporating new road improvements, the members of Local 1190

> were certainly given no inkling, and had no reason to anticipate, there would be wholesale reduction otherwise, based on the Company's unilateral decision to change the course of nearly all existing routes. [Opinion at 13.]

McGarry conceded during the hearing that Western Electric would not have obtained approval of the new Base Location if the members of Local 1190 were aware of the impending route revisions, and that McGarry had consciously withheld this information to avoid "muddying the waters." In this circumstance the arbitrator concluded that Western Electric had an obligation to reveal its intentions of exercising the right it claims to make unilateral route revisions. Having concealed this intention to obtain the benefit of a new Base Location, the arbitrator concluded that Western Electric was estopped from making those revisions during the life of the 1974 national agreement.

While it is true that the arbitrator placed heavy emphasis on the August 9 agreement and the negotiations preceding it in making his finding of estoppel, his opinion is not, as Western Electric contends, simply an interpretation of that agreement. The negotiations and agreement, along with Western Electric's past practice of joint route selection in the New York Installation area were all relevant and appropriate sources of guidance in determining whether Art. 13, par. 2.18 had any force and effect in the context of the disputed route revisions. Rather than improperly relying on his own concept of "fundamental fairness" the arbitrator looked to the relevant "industrial common law" and basic principles of construction, including the principle of estoppel, to reach his interpretation of the con-

tract. *Warrior & Gulf, supra; White Motor, supra; Humble Oil, supra; Honold Mfg. Co., supra; H. K. Porter v. United File & Steel Prod. Workers,* 333 F.2d 596 (3d Cir. 1964). Just as in *General T., C. & H., Loc. U. No. 249 v. Potter-McCune,* 412 F.Supp. 8, 12 (W.D.Pa.1976), his decision was "rooted in estoppel construction," and drew its essence from the 1974 collective bargaining agreement.

Although we might have reached a different conclusion on the estoppel question, we do not sit to determine the merits. We find therefore that the arbitrator did interpret the parties' contractual rights in light of the relevant conduct of the parties in the New York area. In the sense that Western Electric was estopped from relying upon Art. 13, par. 2.18, the arbitrator in effect found that there was nothing in the 1974 collective bargaining agreement authorizing the conduct of Western Electric. Having done so, his award satisfies the test of *Enterprise, supra,* and must be enforced.

SO ORDERED.